UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

D'ÉMON O'DELL'BEY,
    *Plaintiff*,

v.

SCOTT SEMPLE *et al.*,
    *Defendants.*

No. 3:19-cv-00304 (JAM)

**INITIAL REVIEW ORDER**

Plaintiff D'émon O'dell'bey (legal name Jayquan Dilday) is a pretrial detainee and has filed this lawsuit against various officials of the Connecticut Department of Correction ("DOC") arising from his placement in restrictive confinement. He alleges that he was wrongly placed in the DOC's Security Risk Group (SRG) program—a program that subjects detainees suspected of affiliations with certain criminal gangs to more restrictive conditions of confinement.[1] For the reasons stated below, I will allow most of O'dell'bey's claims to proceed except official capacity damages claims and those claims alleging violations of O'dell'bey's constitutional right to assistance of counsel and access to the courts.

**BACKGROUND**

O'dell'bey's complaint names the following five defendants in their official and individual capacities: Scott Semple, the DOC Commissioner; John Aldi, the Counselor Supervisor for the DOC's SRG/Gang Management Unit; Antonio Santiago, the DOC Director of Security; David Maiga, DOC's Director of Offender Classification and Population Management; and Nick Rodriguez, the Warden of the Northern Correctional Institution.[2]

---

[1] *See* Connecticut State Department of Correction, Administrative Directive 6.14 (Security Risk Groups), available at https://portal.ct.gov/DOC/AD/AD-Chapter-6 [https://perma.cc/DRH2-BNNF] (last accessed Jan. 9, 2019).

[2] I take judicial notice that Scott Semple is no longer the DOC Commissioner, having been replaced in that capacity by Rollin Cook, and that Nick Rodriguez is no longer the Warden of Northern Correctional Institution, having been

The following facts are alleged in the complaint (Doc. #1) and are accepted as true only for purposes of this ruling. In 2014 and 2015, O'dell'bey served a nine-month sentence for "minor charges" at an unnamed Connecticut correctional facility. Doc. #1 at 4 (¶ 19). On January 9, 2015, during the term of that sentence, O'dell'bey was wrongfully designated a member of the Bloods, a well-known gang, after the DOC intercepted a letter in which O'dell'bey described the recipient as a "Blood," a term O'dell'bey explains was meant in the sense of "Bro, Brother, Fam, or Family." *Id*. at 4 (¶ 18). O'dell'bey acquiesced to this designation at the time, "in a state of youth and naivety, to avoid further detriment from a possible guilty finding after measuring it to the length of his sentence." *Ibid*.

Nonetheless, the DOC concluded based on this letter that O'dell'bey should be placed in the SRG program, and O'dell'bey retained that designation until his release on September 11, 2015. *Id*. at 4 (¶ 19). O'dell'bey was designated a gang member without any form of hearing or notice, notwithstanding the procedures set forth in DOC's Administrative Directive 9.4. *Id*. at 3 (¶ 27). It appears that, although O'dell'bey served out his specified term of incarceration, he did not (and perhaps could not in the time remaining in his sentence) complete the specified SRG programming. *Id*. at 3 (¶ 23).

At all times, O'dell'bey claims that defendants Miaga and Semple "are responsible for [O'dell'bey's] placement in a restrictive housing unit because as Director of Offender Classification and Population Management, Defendant Miaga makes the assessment of the offender and determines his overall risk level and needs, which determines what level prison one goes to and as Commissioner defendant Scott Semple has the final say." *Id*. at 8 (¶ 57).

---

replaced in that capacity by Roger Bowles. In accordance with Fed. R. Civ. P. 26(d), the Clerk of Court shall substitute Cook for Semple and Bowles for Rodriguez in their official capacities; Semple and Rodriguez remain defendants in their individual capacities.

2

Meanwhile, "Defendants John Aldi and A. Santiago are answerable for the conditions that were imposed on the plaintiff, because as the SRG Coordinator . . . John Aldi proposes security provisions in the SRG program and [Director of Security] Santiago approves or denies them." *Id*. at 8 (¶ 58).

O'dell'bey was re-arrested on May 3, 2018, on charges of third-degree burglary, among other things. He was remanded to the custody of the DOC in advance of trial. He is presently incarcerated in the Corrigan-Radgowski Correctional Center ("Corrigan"), and his case remains pending.[3]

While awaiting trial on his present set of charges, O'dell'bey was initially incarcerated in the Bridgeport Correctional Center. Doc. #1 at 3 (¶ 21). While there, O'dell'bey was once again designated a gang member and placed in a Restrictive Housing Unit (RHU), where he was separated from the general population, handcuffed upon exiting the cell, denied access to the phone, forced to eat in his cell, limited to three showers and two changes of clothes a week, and given a "Ferguson gown" (a tear-resistant single-piece outer garment designed to be unable to be used as a noose) because, the guard informed O'dell'bey, Bridgeport Correctional Center had the highest suicide attempt rates of any prison in the state. *Id*. at 3 (¶¶ 21-22).

When O'dell'bey was transferred to Corrigan, he was once again designated as a Blood and transferred to the facility's SRG block "for a failure to complete the security risk group program on his prior sentence." *Id*. at 3 (¶ 23). At the SRG block, O'dell'bey was extorted by other inmates, who unlike him really were Bloods, and who told O'dell'bey he could not live

---

[3] *See* State of Connecticut Department of Corrections, Inmate Information, http://www.ctinmateinfo.state.ct.us/detailsupv.asp?id_inmt_num=384592 [https://perma.cc/LX5L-VRRD] (accessed Jan. 8, 2019) (current incarceration); State of Connecticut Judicial Branch, Pending Cases Search by Defendant, https://www.jud2.ct.gov/crdockets/CaseDetail.aspx?source=Pending&Key=fb4cf28f-a181-452e-9522-8609f97a71d2 [https://perma.cc/73RM-2ULC] (last accessed Jan. 8, 2019) (current cases).

amongst them when he failed to pay protection money. *Id*. at 3 (¶ 28). A Captain Tommaro moved O'dell'bey from B-Pod to E-Pod—still in the SRG block—because of "issues" O'dell'bey had with the Bloods, *id*. at 3 (¶ 29), but problems continued and ultimately O'dell'bey was attacked by a gang member. *Id.* at 3 (¶ 30). O'dell'bey was punished for defending himself from this attack; he was placed in a more restrictive housing unit and was issued a class A ticket. *Ibid*.

O'dell'bey applied for protective custody while housed in the Corrigan SRG block, but before this application could be acted upon, he was transferred to the MacDougall-Walker Correctional Institution's SRG block. *Id*. at 3 (¶ 30). At or around the time of the transfer, defendant Aldi told O'dell'bey that O'dell'bey's assignment to SRG status was punitive, and that Aldi understood the DOC's administrative guidelines to permit punitive assignment of SRG status. *Id*. at 3, 5 (¶¶ 30-31).

Throughout O'dell'bey's time as an SRG designee, he was subjected to various restrictions not imposed on other prisoners. These included a limitation on his phone calls to three per week—even when O'dell'bey was using the phone to prepare for his defense— forfeiture of good behavior credit, ineligibility for community supervision, a bar on visitors other than immediate family members, a limitation of three showers per week, strip-searches each time he left his cell, and a ban on using the law library or leisure library. *Id*. at 5 (¶ 32). O'dell'bey characterizes his SRG housing as a "hostile environment," *ibid*., owing to the presence of hardened convicted criminals who have "extorted and assaulted" him. *Id.* at 7 (¶ 52).

O'dell'bey made a written request to defendant Santiago to be relieved from at least some of these conditions, complaining about his inability to consult his lawyer over the phone (more than the permitted three times per week), his lack of access to the law library, and the invasion of

his privacy caused by the strip-searches. *Id*. at 5 (¶ 34). Defendant Santiago did not respond. *Ibid*. In July 2018, O'dell'bey filed a grievance, articulating the same complaints; there was still no response. *Id*. at 5 (¶ 36). Nor was there a response to O'dell'bey's appeal of the constructive denial of his grievance. *Id*. at 7 (¶ 53).

Later in June 2018, however, O'dell'bey was served an SRG ticket that, he alleges, falsely accused him of using "SRG language" in a letter to his mother. O'dell'bey was formally designated a gang member at a hearing held in August 2018 solely based on evidence presented by defendant Aldi. In addition to a renewed SRG classification, O'dell'bey was punished with a 90-day loss of phone privileges except for two legal calls per month. *Id*. at 6 (¶¶ 39, 45). O'dell'bey appealed this determination, but his appeal was denied and his subsequent level three appeal was denied in November 2018. *Id*. at 8 (¶ 64). He also wrote a letter to defendants Semple, Aldi, Miaga, and Santiago in August 2018 complaining about all of the above, a letter to which the defendants failed to reply. *Id*. at 6 (¶ 42).

At some point thereafter, O'dell'bey was reassigned from Phase 2 of the SRG program to Phase 1 and transferred "under the discretion of" defendants Miaga, Semple, and Aldi to Northern Correctional Institution ("Northern CI"), Connecticut's "level 5 supermax facility," which imposed restrictions on him in addition to those detailed above: he was shackled whenever outside his cell, handcuffed during his one hour of recreation, and barred from the use of television or CDs (but permitted the use of radio). *Id*. at 7 (¶ 49). These conditions caused O'dell'bey "physical, emotional and mental pain," *Id*. at 7 (¶ 51), including depression and "auditory and visual hallucination under the authority of psychiatric professionals and doctors." *Id*. at 7 (¶ 52).

In October 2018, O'dell'bey requested a transfer from Northern CI, arguing his placement there, and in the SRG, was unconstitutional; there was no response to his request. *Id*. at 8 (¶ 55). Two days later, O'dell'bey stopped defendant Rodriguez while Rodriguez was on a tour of Northern CI and requested a transfer, "informing him of [O'dell'bey's] misplacement." *Id*. at 8 (¶ 60). Rodriguez replied that he would not fix the situation, which, Rodriguez said, was a consequence of O'dell'bey's gang membership. O'dell'bey filed this suit in March 2019, and remains subject to these conditions.

I understand O'dell'bey's complaint to allege the following constitutional claims.

First, O'dell'bey claims that because SRG status brings about a wide variety of harsh conditions that can only be characterized as punitive, an assignment to SRG status is punishment of a pretrial detainee, in violation of the substantive due process component of the Fourteenth Amendment.

Second, O'dell'bey claims that, even if pretrial detainees may be placed in restrictive housing, defendants Aldi and Santiago violated O'dell'bey's procedural due process rights by (a) carrying over O'dell'bey's SRG status from his prior term of incarceration as a sentenced prisoner to apply to his current term of pre-trial detention and (b) by extending or reaffirming O'dell'bey's SRG status, all in violation of the procedural due process component of the Fourteenth Amendment.

Third, O'dell'bey claims that Miaga, Aldi, Semple, and Santiago violated O'dell'bey's Fourth Amendment right to personal security and Fourteenth Amendment substantive and procedural due process rights by instituting a policy of strip-searching SRG designees each and every time prisoners left their cell.

Fourth, O'Dell'bey claims that defendants Semple, Santiago, and Rodriguez created and enforced a policy imposing certain restrictions on his legal communication—specifically a ban on access to the law library and limitations on legal phone calls—that cumulatively inhibited his ability to call potential witnesses in his defense, violating his Sixth Amendment right to assistance of counsel and his constitutional right of access to the courts.[4]

The complaint seeks money damages against the defendants. It also seeks a declaratory judgment that the defendants violated the Fourth, Sixth, and Fourteenth Amendments, and an injunction "(1) to remove the plaintiff from the security risk group and off the computer; (2) that pretrial detainees be discluded [sic] from the Security Risk Group program; (3) [that] pretrial detainee[s] get a minimum of 4 legal calls a month to an attorney or bondsmen; (4) th[at] pretrial detainee with nonviolent offenses [be] exempt from unnecessary strip-searches; (5) and that the Blanket Strip-search policy be respected and a notice be posted throughout [the DOC] informing correctional officers and detainees of it." Doc. #1 at 10 (¶ E).

## DISCUSSION

Pursuant to 28 U.S.C. § 1915A, a district court must review a prisoner's civil complaint against a governmental entity or governmental actors and "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint—(1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or (2) seeks monetary relief from a defendant who is immune from such relief." If the prisoner is proceeding *pro se*, the allegations of the complaint must be read liberally to raise the strongest arguments that they suggest. *See Tracy v. Freshwater*, 623 F.3d 90, 101-02 (2d Cir. 2010).

---

[4] I do not understand O'dell'bey to claim that the defendants restricted in-person visits by O'dell'bey's counsel, or restricted access to O'dell'bey's legal mail.

In recent years, the Supreme Court has set forth a threshold "plausibility" pleading standard for courts to evaluate the adequacy of allegations in federal court complaints. A complaint must allege enough facts—as distinct from legal conclusions—that give rise to plausible grounds for relief. *See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Notwithstanding the rule of liberal interpretation of a *pro se* complaint, a *pro se* complaint may not survive dismissal if its factual allegations do not meet the basic plausibility standard. *See, e.g.*, *Fowlkes v. Ironworkers Local 40*, 790 F.3d 378, 387 (2d Cir. 2015).

### *Official capacity damages claims*

O'dell'bey alleges claims against all the defendants in their official and individual capacities. As to O'dell'bey's claims for money damages against the defendants in their official capacities, because they are state employees, the defendants are entitled to the benefit of the State of Connecticut's sovereign immunity with respect to these claims for money damages. *See Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985). Accordingly, I will dismiss all claims for money damages against the defendants in their official capacities.

### *Substantive due process right of pretrial detainee not to be subject to punitive restrictive confinement*

O'dell'bey alleges that his substantive due process rights as a pretrial detainee were violated because SRG or RHU restrictive confinement is punitive in nature. Liberty restrictions on a pretrial detainee may not amount to punishment of the detainee. *See Bell v. Wolfish*, 441 U.S. 520, 535-37 (1979); *see also Allah v. Milling*, 876 F.3d 48, 55 (2d Cir. 2017); *Benjamin v. Fraser*, 264 F.3d 175, 188 (2d Cir. 2001) ("restrictions on pretrial detainees that implicate a liberty interest protected under the Due Process Clause may not 'amount to punishment of the detainee'").

8

In assessing whether restrictions on pretrial detainees comport with substantive due process, "[a] court must decide whether the [condition] is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." *Bell*, 441 U.S. at 538. Without a showing of an "expressed intent to punish on the part of detention facility officials that determination generally will turn on 'whether an alternative purpose to which the restriction may rationally be connected is assignable for it, and whether it appears excessive in retaliation to the alternative purposes to it.'" *Ibid*. Thus, "if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees." *Id*. at 539.

Conversely, "if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'" *Ibid*. Legitimate government objectives include "maintain[ing] security and order at the institution and mak[ing] certain no weapons or illicit drugs reach detainees," "ensuring a detainee's presence at trial," and "manag[ing] the facility in which the individual is detained." *Id*. at 540; *see generally Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69 (1963) (listing relevant factors in this analysis).

O'dell'bey's complaint expressly alleges that defendant Aldi said that the SRG program *was* "punitive," Doc. #1 at 5 (¶ 31), and that the imposition of SRG status and its attendant restrictions was a "consequence of [O'dell'bey's] being a gang member," *id*. at 8 (¶ 61). Given that defendant Aldi is the Counselor Supervisor of the program, these alleged statements are plainly an "expressed intent to punish on the part of detention facility officials," *Bell*, 441 U.S. at

9

538, and suffice to state a substantive due process claim that O'dell'bey's placement in the SRG program was an unconstitutional punishment of a pretrial detainee.

Even if I were to disregard these statements, O'dell'bey states a plausible claim that many of the restrictions placed on him were not "reasonably related to [the] legitimate governmental objective[s]" of ensuring his presence at trial or ensuring safety in prison facilities. *Bell*, 441 U.S. at 539. Certainly, some of the conditions of SRG confinement, particularly limitations on social intercourse between the inmates, could reasonably advance prison safety by preventing gangs from organizing behind bars. But it is not at all clear how prison safety or security is advanced by Dickensian measures like denying inmates regular showers, barring inmates from reading books in the prison library, limiting communications between inmates and their lawyers as they prepare for trial, preventing inmates from listening to recorded music, or strip-searching inmates each and every time they leave their cell. *See Allah*, 876 F.3d at 58.[5]

Because the alleged restrictions here are "not reasonably related to a legitimate goal," the Court "permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees." *Bell*, 441 U.S. at 539. *See generally Benway v. Aldi*, 2019 WL 4762117, at *11 (D. Conn. 2019). And because the complaint alleges each of the defendants either enforced the policies permitting the depredations of SRG classification to be applied to pretrial detainees or acted to assign O'dell'bey to that classification, I will permit O'dell'bey's substantive due process claim to proceed against the defendants in their official capacities as to injunctive relief and in their individual capacities as to damages.

---

[5] I need not determine whether these restrictions, either individually or in combination, amount to the imposition of an "atypical and significant hardship ... in relation to the ordinary incidents of prison life," as required by *Sandin v. Conner*, 515 U.S. 472, 484 (1995), because the stricter standards of *Sandin* do not apply to pretrial detainees. *See Benjamin v. Fraser*, 264 F.3d 175, 188–89 (2d Cir. 2001).

### *Due process right of pretrial detainee not to be subject to punitive restrictive confinement without notice and a hearing*

The Second "Circuit has found that procedural due process requires that pretrial detainees can only be subjected to segregation or other heightened restraints if a pre-deprivation hearing is held to determine whether any rule has been violated." *Johnston v. Maha*, 606 F.3d 39, 41 (2d Cir. 2010).

Upon his arrest for the charges presently pending against him, O'dell'bey explains that he was designated a gang member solely because he had been previously been designated a gang member while serving a prior sentence—a designation he accepted at the time. Doc. #1 at 3 (¶ 23). O'dell'bey argues that the failure to hold a pre-deprivation hearing when he was detained amounts to a denial of due process. O'dell'bey further alleges that the named defendants either created or enforced this policy as applied to him.

At this initial review stage, I will permit O'dell'bey's claim to proceed. Read in the light most favorable to the plaintiff, O'dell'bey's complaint alleges a blanket DOC policy that essentially extends to a pre-trial detainee the conditions of incarceration imposed on them while serving a sentence of conviction without any consideration either of the detainee's pretrial status or the defendant's activities between periods of incarceration. In other words, the DOC's policy seems to mean that a gang member could leave prison (with an unexpired gang member designation), publicly renounce his former gang members, move to a different town, and spend twenty years living an entirely blameless life, only, upon being arrested for a crime he did not commit, be designated and punished as a gang member as if he never left. Such a policy would plainly violate due process. *See Allah*, 876 F.3d at 55-57 (finding due process violated where pretrial detainee subject to SRG solely based on prior assignment to SRG program during term of previous imprisonment).

11

Accepting at this stage O'dell'bey's characterization of the SRG designation as disciplinary (an inference drawn from his characterization of the designation as "punitive"), the defendants were obligated to give O'dell'bey the process required by the Supreme Court in *Wolff v. McDonnell*, 418 U.S. 538, 561-70 (1974): written notice, adequate time to prepare a defense, a written statement of the reasons for action taken, and a limited ability to present witnesses and evidence before subjecting him to SRG status. *See Benjamin v. Fraser*, 264 F.3d 175, 190 (2d Cir. 2001). Even assuming SRG designations were administrative in nature, *see ibid*., the defendants were obligated to provide O'dell'bey with "some notice of the charges against him and an opportunity to present his views," *see Hewitt v. Helms*, 459 U.S. 460, 476 (1983). O'dell'bey alleges that the defendants did not provide him with notice or any type of hearing or other opportunity to make a statement in his defense before they placed him in the SRG program. These allegations suffice to state a claim for violation of his procedural due process rights.

O'dell'bey alleges that a subsequent hearing that confirmed his SRG status was founded on falsified evidence presented by Aldi. But the Second Circuit has made clear that the presentation of false evidence at a prison disciplinary hearing does not, on its own, support a procedural due process claim if the inmate was afforded a fair opportunity to refute the charges. *See Livingston v. Kelly*, 423 F. App'x 37, 40 (2d Cir. 2011); *Freeman v. Rideout*, 808 F.2d 949, 953 (2d Cir. 1986).

Accordingly, I will permit O'dell'bey's procedural due process claim to proceed against the defendants in their official capacities as to injunctive relief and in their individual capacities as to damages on two bases only: (1) the policy of blanket redesignations of pretrial detainees as gang members based on prior terms of imprisonment; and (2) lack of notice and hearing of the initial SRG determination.

*Fourth Amendment*

O'dell'bey alleges that the defendants violated his Fourth Amendment rights when they either created or enforced a policy of indiscriminate strip-searches, which required him and all SRG designees to be strip-searched each and every time they left their cells.

Pretrial detainees retain a Fourth Amendment right to bodily privacy consistent with the security needs of a prison facility. *See generally Harris v. Miller*, 818 F.3d 49, 57-63 (2d Cir. 2016) (*per curiam*) (discussing multiple factors to be considered for prisoner's claim of Fourth Amendment violation from visual body cavity search). For purposes of a Fourth Amendment claim, a court should consider whether the inmate has exhibited an actual, subjective expectation of bodily privacy and whether prison officials had sufficient justification to intrude on the inmate's privacy in the manner they did. *Id*. at 57, 62-63 (factors to consider include the scope of the particular intrusion, the manner in which it was conducted, the justification for initiating it, and the place in which it was conducted).

If "the inmate's Fourth Amendment claim challenges a prison regulation or policy, courts typically analyze the claim under *Turner v. Safley*, 482 U.S. 78 (1987)." *Harris*, 818 F.3d at 57-58. In *Turner*,

> the Court listed four factors governing the review of prison regulations: (i) whether there is a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it; (ii) whether there are alternative means of exercising the right in question that remain open to prison inmates; (iii) whether accommodation of the asserted constitutional right will have an unreasonable impact upon guards and other inmates, and upon the allocation of prison resources generally; and (iv) whether there are reasonable alternatives available to the prison authorities. The burden is upon the prisoner to show that a challenged prison regulation is unreasonable.

*Covino v. Patrissi*, 967 F.2d 73, 78–79 (2d Cir. 1992) (citing *Turner*, 482 U.S. at 89–90). At this preliminary stage, I conclude that O'dell'bey's complaint meets the *Turner* standard. Conceding the first factor *arguendo*—that a policy of compulsory strip-searches each and every time a prisoner moves from his cell to another part of the facility has a valid and rational connection to prison security—the remaining factors cut against the defendants if O'dell'bey's complaint is taken as true.

As for the second factor: in common with all pretrial detainees, O'dell'bey has a limited right of bodily privacy even in the prison context, *see Covino v. Patrissi*, 967 F.2d 73, 78 (2d Cir. 1992), and strip-searches by their nature render his right to bodily privacy unable to be exercised. The third and fourth *Turner* factors also weigh in O'dell'bey's favor, because a policy that insists on stripping inmates down *each and every time* they leave their cells is, if anything, more draining on prison resources—and more intrusive upon prisoners—than the more commonly-observed prison policy of random strip-searches. *Cf. Covino*, 967 F.3d at 79-80 (approving random-search policy). Accordingly, I will permit O'dell'bey's Fourth Amendment claim to proceed against the defendants in their official capacities as to injunctive relief and in their individual capacities as to damages.

### *Sixth Amendment and access to courts*

O'dell'bey alleges that the defendants violated his Sixth Amendment right to counsel by restricting the number of telephone calls he could make to his attorney during his confinement in the SRG program, and hindered his right of access to the courts by depriving him of access to the prison's law library. I will consider each deprivation in turn.

Restrictions on phone calls to a pretrial detainee's attorney implicates the detainee's Sixth Amendment rights. The Sixth Amendment protects the right of inmates to "have a reasonable

opportunity to seek and receive the assistance of attorneys," and policies and practices that "unjustifiably obstruct the availability of professional representation or other aspects of the right of access to the courts are invalid." *Procunier v. Martinez*, 416 U.S. 396, 419 (1974), *partially overruled on other grounds by Thornburgh v. Abbott*, 490 U.S. 401 (1989). Thus, a regulation that restricts a detainee's opportunity to be in contact with his attorney is "unconstitutional" if it "'unreasonably burdened the inmate's opportunity to consult with his attorney and to prepare his defense.'" *Benjamin*, 264 F.3d at 187 (*quoting Wolfish v. Levi*, 573 F.2d 118, 133 (2d Cir. 1978)).

O'dell'bey alleges that during his initial confinement in the SRG program, the defendants permitted him to make no more than three telephone calls per week. Doc. 1 at 5 (¶ 32). These restrictions limited his ability to "obtain witnesses in his favor, to prepare a defense with an attorney, prepare for a sentence and post bonds." *Ibid*. From August 12, 2018 to January 10, 2019, O'dell'bey claims that he was further restricted to two telephone calls per month. *Id*. at 6 (¶ 43-44). It is unclear whether O'dell'bey's calls continue to be restricted; his request for injunctive relief implies that he would not find the restrictions unreasonable if he was permitted one legal phone call per week, *id*. at 10 (¶ E(3)), and so a restoration of the pre-August 2018 arrangements (three calls per week) would appear to moot his request for injunctive relief on this point, at the least.

O'dell'bey alleges only in a conclusory fashion that the restrictions placed on his calls to his defense attorney prejudiced his defense. Although he alleges restrictions on his initiation of calls to his attorney, he does not allege that defendants stopped his attorney from initiating calls to him, or visiting him, or sending him legal mail concerning the case. Courts have held that an inmate's Sixth Amendment right to counsel is not unreasonably burdened if he has other means

15

to contact his attorney. *See, e.g.*, *Dublino v. McCarthy*, 2019 WL 2053829, at *14 (N.D.N.Y. 2019) ("Conversely, courts have found that denying an inmate one method of communicating confidentially with his attorney does not give rise to a constitutional violation.") (collecting cases); *Lowery v. Westchester Cty. Dep't of Correction*, 2017 WL 564674, at *4 (S.D.N.Y. 2017) ("The unavailability of a private video telephone can hardly be said to "unreasonably burden[ ] the inmate's opportunity to consult with his attorney and to prepare his defense.") (quoting *Benjamin*, 264 F.3d at 187)).

Given that O'dell'bey had alternative methods of contacting his attorney during the period when his access to the telephone was limited, and he did not indicate that these alternative methods were inadequate to permit him to prepare his case, O'Dell'bey has not pled facts sufficient to state a violation of his Sixth Amendment right to counsel.

O'dell'bey's complaint about restrictions on his use of the law library implicates his constitutional right of access to the courts. *See Christopher v. Harbury*, 536 U.S. 403, 414-15 & n.12 (2002); *see also Blake v. Dowe*, 36 F. Supp. 3d 271, 276-77 (D. Conn. 2014). The Supreme Court has explained that the right of access to the courts "requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance form persons trained in the law." *Bounds v. Smith*, 430 U.S. 817, 828 (1977). But "[b]ecause *Bounds* did not create an abstract, freestanding right to a law library or legal assistance, an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense." *Lewis v. Casey*, 518 U.S. 343, 351 (1996). Instead, a prisoner "must go one step further and demonstrate that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim." *Ibid*. In addition, "when a prisoner with appointed counsel

claims that he was hindered by prison officials in his efforts to defend himself or pursue other relevant legal claims, he must show that, on the facts of his case, the provision of counsel did not furnish him with the capability of bringing his challenges before the courts, not that he was denied effective representation in the court." *Bourdon v. Loughren*, 386 F.3d 88, 98 (2d Cir. 2004).

To state a claim for denial of access to the courts, a plaintiff represented by counsel must describe how the defendants frustrated his appointed attorney's ability to conduct his defense. *See Christopher*, 536 U.S. at 416-18; *Loughren*, 386 F.3d at 98. O'dell'bey's complaint does not do this; it is solely concerned with frustration of O'dell'bey's personal efforts to prepare the case. Doc. #1 at 5 (¶ 32). O'dell'bey failure to explain how depriving *him* of the services of the prison law library impeded his *attorney's* preparation of his criminal case means that he has failed to state a claim for a denial of his right to access the courts. *See Awad v. Semple*, 2019 WL 1922294, at *2 (D. Conn. 2019); *Fowler v. Dep't of Corr.*, 2017 WL 3401252, at *7 (D. Conn. 2017).

Accordingly, O'dell'bey's Sixth Amendment right to counsel and access to courts claims are dismissed without prejudice. O'dell'bey may, if he wishes, move to amend his complaint to state specifically how the restrictions on his legal telephone calls or law library access frustrated his defense. *See generally Hannon v. Schulman & Assocs.*, 2015 WL 3466847, at *4 (D. Conn. 2015) (discussing in detail the kind of allegations that might be pleaded to make out a claim on this basis), *aff'd*, 634 F. App'x 61 (2d Cir. 2016).

CONCLUSION

On the basis of the foregoing, the Court enters the following orders:

1. The Clerk is directed to correct the case caption to name the following defendants in this action: Scott Semple and Nick Rodriguez in their individual capacities only; DOC Commissioner Rollin Cook and Northern Correctional Institution Warden Roger Bowles in their official capacities only; John Aldi, the Counselor Supervisor for the DOC's SRG/Gang Management Unit; Antonio Santiago, the Director of Security for the State of Connecticut's Department of Correction; and David Maiga, DOC's Director of Offender Classification and Population Management, in their individual and official capacities.

2. This action shall proceed against all named defendants in their aforementioned capacities as to the following claims: (a) violation of O'dell'bey's substantive due process right not to be subject to punitive restrictive confinement as a pretrial detainee; (b) violation of O'dell'bey's procedural due process right not to be subject to restrictive confinement without notice and a hearing; and (c) violation of O'dell'bey's Fourth Amendment rights to bodily privacy.

3. O'Dell'bey's Sixth Amendment and access to courts claims are DISMISSED without prejudice to O'dell'bey's filing of an amended complaint, within 30 days of this order, stating with specificity how restrictions on phone calls to counsel or the law library impeded his defense, with particular attention to how (if at all) they have impeded the work of his appointed attorney, and stating whether the complained-of deprivations are ongoing or have ceased;

4. The Clerk shall verify the current work addresses for the named defendants with the DOC Office of Legal Affairs, mail a waiver of service of process request packet containing the third amended complaint to those defendants at the confirmed addresses within **twenty-one (21) days** of this Order, and report to the Court on the status of the waiver requests on the **thirty-fifth (35) day** after mailing. If any defendant fails to return the waiver request, the Clerk shall make arrangements for in-person service by the U.S. Marshals Service on him, and he shall be required to pay the costs of such service in accordance with Fed. R. Civ. P. 4(d).

5. The named defendants shall file their response to the third amended complaint, either an answer or motion to dismiss, within **sixty (60) days** from the date the notice of lawsuit and waiver of service of summons forms are mailed to them.

6. The Clerk shall send a courtesy copy of the complaint and this Order to the DOC Office of Legal Affairs.

7. The discovery deadline is extended to **six months (180 days)** from the date of this Order. The deadline for summary judgment motions is extended to **seven months (210 days)** from the date of this Order.

It is so ordered.

Dated at New Haven, Connecticut this 10th day of January 2020.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge